Nos. 22-15513 & 22-16348

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

        v.

BATTLE BORN INVESTMENTS COMPANY, LLC; FIRST 100 LLC; 1ST ONE HUNDRED HOLDINGS LLC,

    Claimants-Appellants,

        v.

APPROXIMATELY 69,370 BITCOIN (BTC), BITCOIN GOLD (BTG), BITCOIN SV (BSV), AND BITCOIN CASH (BCH),

    Defendant.

---

**UNITED STATES'S ANSWERING BRIEF**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 20-CV-7811 RS

---

**STEPHANIE M. HINDS**
United States Attorney

**MATTHEW M. YELOVICH**
Chief, Appellate Section
Criminal Division


**February 7, 2023**

**MERRY JEAN CHAN**
Assistant United States Attorney

450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7200

**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

JURISDICTION AND TIMELINESS .................................................... 2

ISSUES PRESENTED ............................................................................ 3

STATEMENT OF FACTS ....................................................................... 4

    A.    Bitcoin overview ........................................................... 4

    B.    Silk Road and bitcoin ................................................... 6

    C.    Takedown of Silk Road and SDNY's October 2013 forfeiture action against bitcoin in wallets residing on Silk Road servers ...................... 8

    D.    NDCA's November 2020 forfeiture action against bitcoin seized from 1HQ3, which has given rise to the instant appeal ..................... 10

        1.    Individual X's consent to forfeiture ......................................... 10

        2.    Government's complaint and notice ......................................... 10

        3.    Timely claims and motions to intervene ................................. 12

        4.    Untimely claims and motion to intervene ............................... 13

        5.    Battle Born's untimely claims and answers ........................... 13

        6.    Battle Born's discussions with the government ...................... 14

        7.    The government's motion to strike Battle Born's claims ........ 17

        8.    Battle Born's opposition ......................................................... 19

        9.    Government's reply ................................................................. 22

        10.    The district court's order ........................................................ 24

i

SUMMARY OF ARGUMENT .................................................................25

ARGUMENT ......................................................................................27

I.     The district court did not err in granting the government's motion
to strike Battle Born's claims ...............................................27

     A.     Standards of review..................................................27

     B.     Legal principles.......................................................28

     C.     Because Battle Born failed to unequivocally claim
ownership to the Defendant Property, the district court
was right to strike their claims on the pleadings......................32

     D.     Dismissal by summary judgment for lack of standing was
also justified ...........................................................37

     E.     The district court did not err in striking Battle Born's claims
for lack of standing without allowing them to first conduct
unwarranted and protracted discovery .....................................45

     F.     Alternatively, this Court may affirm the district court's order
striking Battle Born's claims because they were untimely.......47

     G.     Alternatively, this Court may affirm because Battle Born
could not show themselves to be innocent owners..................50

II.     PRIOR TO THE ENTRY OF JUDGMENT, THIS COURT
LACKED JURISDICTION TO CONSIDER APPEAL OF THE
ORDER STRIKING BATTLE BORN'S CLAIMS, BUT THAT
ISSUE IS MOOT AND THIS COURT SHOULD DISMISS
C.A. NO. 22-15513 ...............................................................52

     A.     Standard of review ..................................................52

     B.     The jurisdictional issue is moot ................................52

C.   Should the Court reach the question, it should conclude that it has no jurisdiction over a pre-judgment ordering striking a claim to property in a forfeiture proceeding, where the district court has not certified the order for immediate appeal under Fed. R. Civ. P. 54(b) ................................................................53

CONCLUSION ........................................................................................60

STATEMENT OF RELATED CASES ....................................................61

CERTIFICATE OF COMPLIANCE ........................................................62

## TABLE OF AUTHORITIES

### <u>FEDERAL CASES</u>

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949).......................... 54, 55

*Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) .......................53

*Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686 (9th Cir. 2018).......................53

*Devlin v. Scardelletti*, 536 U.S. 1 (2002).................................................................58

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997).....................38

*Greenwood v. FAA*, 28 F.3d 971 (9th Cir. 1994).....................................................32

*Hall v. Beals*, 396 U.S. 45 (1969)............................................................................53

*Hart v. Massanari*, 266 F.3d 1155 (9th Cir. 2001).................................................56

*In re McDonald*, 205 F.3d 606 (3d Cir. 2000).........................................................57

*In re N. Am. Coin & Currency, Ltd.*, 767 F.2d 1573 (9th Cir.), *amended*,
    774 F.2d 1390 (9th Cir. 1985) .................................................................... 35, 51

*In re Unicom Computer Corp.*, 13 F.3d 321 (9th Cir. 1994)...................................35

*Kern Oil & Ref. Co. v. Tenneco Oil Co.*, 840 F.2d 730 (9th Cir. 1988).................59

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018).............. 22, 37

*Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957 (9th Cir. 2010) .................28

*Miskey v. Kijakazi*, 33 F.4th 565 (9th Cir. 2022).....................................................32

*Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009) .................................54

*Opara v. Yellen*, 57 F.4th 709 (9th Cir. 2023).................................................. 28, 38

*Pauluk v. Savage*, 836 F.3d 1117 (9th Cir. 2016)...................................................52

*Robert Ito Farm, Inc. v. Cnty. of Maui*, 842 F.3d 681 (9th Cir. 2016) ............ 57, 58

*Sec. & Exch. Comm'n v. Stein*, 906 F.3d 823 (9th Cir. 2018) ......................... 46, 47

*SolarCity Corp. v. Salt River Project Agric. Improvement & Power Dist.*,
    859 F.3d 720 (9th Cir. 2017) ................................................................. 54

*Stevens v. Corelogic, Inc.*, 899 F.3d 666 (9th Cir. 2018) .......................... 28, 45, 46

*Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370 (1987) .................. 57

*United States v. $20,193.39 U.S. Currency*, 16 F.3d 344 (9th Cir. 1994) .............. 35

*United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110
    (9th Cir. 2004) ....................................................................... 18, 48

*United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629
    (9th Cir. 2012) ....................................................................... *passim*

*United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006
    (9th Cir. 2013) ....................................................................... 28, 32

*United States v. $8,440,190.00 in U.S. Currency*, 719 F.3d 49 (1st Cir. 2013) ...... 41

*United States v. $129,374 in U.S. Currency*, 769 F.2d 583 (9th Cir. 1985) ............ 56

*United States v. $31,000.00 in U.S. Currency*, 872 F.3d 342 (6th Cir. 2017) ......... 33

*United States v. $284,950.00 in U.S. Currency*, 933 F.3d 971 (8th Cir. 2019) ....... 37

*United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00)
    in United States Currency*, 859 F.3d 1085 (D.C. Cir. 2017) ............................. 40

*United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*,
    971 F.2d 244 (9th Cir. 1992) ....................................................... 41, 51

*United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432 (9th Cir. 1985) ...... 48

*United States v. Contents of Accts. Numbers 3034504504 & 144-07143 at Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 971 F.2d 974 (3d Cir. 1992) ............................................................................. 56, 57

*United States v. Hernandez-Escobar*, 911 F.3d 952 (9th Cir. 2018)......................35

*United States v. Hooper*, 229 F.3d 818 (9th Cir. 2000)..........................................44

*United States v. Mallory*, 765 F.3d 373 (3d Cir. 2014) ..........................................57

*United States v. Nava*, 404 F.3d 1119 (9th Cir. 2005).............................................34

*United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo-Prop Aircraft, Venezuelan Registration No. YV219T, Serial UC118*, 619 F.3d 1275 (11th Cir. 2010) ................................................................... 50, 52

*United States v. One Lincoln Navigator 1998*, 328 F.3d 1011 (8th Cir. 2003).......44

*United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cnty.*, 787 F.3d 968 (9th Cir. 2015).................................................................. 27, 28, 29, 47

*United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA*, 545 F.3d 1134 (9th Cir. 2008) ..................................................................... 58, 59

*United States v. Real Prop., Buildings, Appurtenances & Improvements at 221 Dana Ave., Hyde Park, Massachusetts*, 261 F.3d 65 (1st Cir. 2001).................51

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003)..................................... 22, 37

*United States v. Romm*, 455 F.3d 990 (9th Cir. 2006)...................................... 45, 53

*United States v. Ulbricht*, No. 14-CR-68 KBF, 2015 WL 13893992 (S.D.N.Y. Apr. 27, 2015).........................................................................6

*United States v. Ulbricht*, No. 14-CR-68 KBF, 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014) ........................................................................6

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) ..............................6

*United States v. Ursery*, 518 U.S. 267 (1996) .........................................................28

## DOCKETED CASES

*First 100 LLC v. Raymond Ngan*, No. A-16-738970
  (Nev. 8th Jud. Dist. – Clark Cty. filed June 23, 2016) ..................................... 15

*In re Raymond Ngan*, No. 2:17bk14166 BTB
  (U.S. Bankrupcy Court, D. Nev. filed July 31, 2017) ..................................... 15

*United States v. Any and All Assets of Silk Road, Including but Not Limited to
  the Silk Road Hidden Website and Any and All Bitcoins Contained in Wallet
  Files Filing on Silk Road Servers, including the Servers Assigned the
  Following Internet Protocol Addresses [] and All Property Traceable Thereto*,
  No. CV-13-06919 (S.D.N.Y. filed Sept. 30, 2013) ........................................ 8, 9

## STATE CASES

*Namow Corp. v. Egger*, 99 Nev. 590 (Nev. 1983) ...................................................35

## FEDERAL STATUTES

18 U.S.C. § 981 ..................................................................................................2, 8

18 U.S.C. § 983 ........................................................................................... *passim*

18 U.S.C. § 3231 ......................................................................................................2

28 U.S.C. § 1291 ......................................................................................... 3, 54, 57

28 U.S.C. § 1292 ....................................................................................................54

## FEDERAL RULES AND REGULATIONS

Fed. R. App. P. 4 ......................................................................................................3

Fed. R. Civ. P. 12 .............................................................................................. 28, 32

Fed. R. Civ. P. 26 .............................................................................................. 29, 30

Fed. R. Civ. P. 54 .................................................................................2, 53

Fed. R. Civ. P. 56 ...................................................................... 21, 31, 32

Fed. R. Civ. P. Supplemental Rule G ........................................... *passim*

28 C.F.R. § 9.2 ..........................................................................................33

## STATE STATUTES

Nev. Rev. Stat. § 31.010 .........................................................................34

**Nos. 22-15513 & 22-16348**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

    v.

BATTLE BORN INVESTMENTS COMPANY, LLC; FIRST 100 LLC; 1ST ONE HUNDRED HOLDINGS LLC,

    Claimants-Appellants,

    v.

APPROXIMATELY 69,370 BITCOIN (BTC), BITCOIN GOLD (BTG), BITCOIN SV (BSV), AND BITCOIN CASH (BCH),

    Defendant.

_____

**UNITED STATES'S ANSWERING BRIEF**

The district court properly granted the government's motion to strike the claim of Claimants-Appellants First 100, LLC; 1st One Hundred Holdings, LLC; and Battle Born Investments Company LLC (herein, collectively, "Battle Born") to the Defendant Property, that is, the contents of the Bitcoin address 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx ("1HQ3"), consisting of approximately 69,370 bitcoin ("BTC"), Bitcoin Gold ("BTG"), Bitcoin SV ("BSV"), and Bitcoin Cash (BCH).  Battle Born failed to plead facts sufficient to

show that it owned the Defendant Property, and the court was not required to allow for discovery. Battle Born's claim was also untimely. This Court should affirm.

## JURISDICTION AND TIMELINESS

The district court (Hon. Richard Seeborg) had jurisdiction under 18 U.S.C. §§ 981 and 3231. The court struck Battle Born's claims on March 25, 2022. CR-104.[1] Battle Born filed a notice of appeal on April 6, 2022, resulting in C.A. No. 22-15513. CR-107, 110. After the parties filed responses to this Court's order to show cause why the appeal should not be dismissed for lack of jurisdiction because the challenged order was not final or appealable, this Court ordered briefing in the appeal to proceed, and directed the parties "to address the basis for this court's jurisdiction over these appeals, including whether an order striking claims in a civil forfeiture action is final or appealable prior to entry of final judgment." C.A. No. 22-15513, Dkts. 2, 11, 14, 15. The government's response is below at pp. 52–59.

After disposing of all the claims against the Defendant Property, and denying Battle Born's request for a separate judgment under Fed. R. Civ. P. 54(b) as both unwarranted and moot, CR-122, the district court entered judgment on August 16, 2022. CR-127. Battle Born timely entered a notice of appeal from the

---

[1] "CR" refers to the district court clerk's record; "ER" to the excerpts of record filed by Battle Born in this appeal; "SER" to the government's supplemental excerpts of record; and "AOB" to Battle Born's opening brief.

judgment on September 7, 2022, resulting in C.A. No. 22-16348. Fed. R. App. P. 4(a)(1)(B)(i); CR-128, 130. This Court has jurisdiction under 28 U.S.C. § 1291.

The two appeals were consolidated. C.A. No. 22-16348 at Dkt. 4.

## ISSUES PRESENTED

I.   Whether the district court properly struck Battle Born's claims on the pleadings for lack of Article III standing, where the claims did not unequivocally assert ownership of the Defendant Property.

II.  Whether the district court's order striking Battle Born's claims for lack of standing was justified on summary judgment, given that Battle Born did not present evidence supporting the truth of Ngan's unsworn assertion to potential buyers that he owned the bitcoin in 1HQ3.

III. Whether, if the district court's order was one for summary judgment, the court properly declined to continue the proceedings to allow for discovery, where Battle Born failed to articulate what facts they were likely to discover that would allow them to survive the motion.

IV.  Whether this Court should affirm the district court's order striking Battle Born's claims on the alternative basis that they were untimely.

V.   Whether this Court should affirm the district court's order striking Battle Born's claims on the alternative basis that their allegations precluded a finding that they were innocent owners of the Defendant Property.

3

VI.     Whether this Court should dismiss the appeal at C.A. No. 22-15513, which raises the same question as presented by C.A. No.22-16348, where the former requires this Court to decide if it had jurisdiction over Battle Born's appeal of the district court's order striking their claim prior to the entry of the final judgement, which is now moot.

### STATEMENT OF FACTS

**A.    Bitcoin overview**

Bitcoin is a type of virtual currency, also known as cryptocurrency or digital currency, which can function as "a medium of exchange, a unit of account, and/or a store of value."  ER-118.  It is not issued by any government or bank but "generated and controlled through computer software operating on a decentralized, peer-to-peer network."  *Id.*  When referring to the protocol, software, and community, "Bitcoin" is capitalized; when referring to units of currency, it is not.  ER-118 n.1.

To send and receive bitcoin, parties use Bitcoin addresses, analogous to a bank account number, represented as a 26-to-35-character-long case-sensitive string of letters and numbers.  ER-118–19.

Each Bitcoin address is controlled using a unique, private key that is the equivalent to a password or PIN.  *Id.*  Without this key, no one can access the funds in a Bitcoin address.  *Id.*  To send bitcoin in a Bitcoin address, the sender

4

must have the private key to that Bitcoin address. ER-119. The sender does not require the private key to the receiving Bitcoin address to complete the transaction; the sender needs only the Bitcoin address of the receiving party. *Id.* The private key is necessary to use a particular Bitcoin address to digitally sign a message from that Bitcoin address. ER-119–20. Thus, sending a signed message from one particular Bitcoin address to another is the typical way a person proves that he or she owns the funds in the sending Bitcoin address. *Id.*

Although "wallet" and "address" are sometimes used interchangeably, a Bitcoin wallet may contain many Bitcoin addresses with their corresponding private keys, and is typically under the control of a single private individual or service. 1-SER-183–84.

When a sender initiates a Bitcoin transaction, the sender transmits a transaction announcement across the peer-to-peer Bitcoin network. ER-119. Once the announcement is verified by the network, the transaction is added to the blockchain, a decentralized public ledger that records the Bitcoin addresses and amount involved in every Bitcoin transaction. *Id.*

The Bitcoin public ledger can be accessed from any computer connected to the Internet through a search program like Google, and anyone can see the balance and all transactions of any Bitcoin address. ER-119. Any person can input a

Bitcoin address into the website blockchain.com and generate a screenshot of that address.  ER-120.

"[R]arely" do either the private key or the Bitcoin address "reflect[] any identifying information about either the sender or the recipient."  ER-119. However, by using software analytics to conduct proprietary analysis of aggregate data (it this exists) that connects cryptocurrency addresses to real-world organizations, investigators can use the blockchain to identify the owner of a particular Bitcoin address.  *Id.*; 1-SER-181.  Blockchain explorer and analytics software are publicly available.  1-SER-184.

## B.  Silk Road and bitcoin[2]

From 2011 until October 2013, when it was seized by law enforcement, Silk Road operated as a criminal marketplace on the Internet for over 13,000 variety of illegal drugs and other unlawful goods and services.  ER-170–71; 1-SER-101–01. Ross Ulbricht designed Silk Road for the purpose of facilitating black-market transactions.  1-SER-102.  The only form of payment accepted on Silk Road was bitcoin.  ER-171.

---

[2]  For background, *see United States v. Ulbricht*, No. 14-CR-68 (KBF), 2015 WL 13893992, at *1–*3 (S.D.N.Y. Apr. 27, 2015) (denying motion for new trial), *aff'd*, 858 F.3d 71 (2d Cir. 2017); *United States v. Ulbricht*, No. 14-CR-68 KBF, 2014 WL 5090039, at *1–*2 (S.D.N.Y. Oct. 10, 2014) (describing some of government's investigation), *aff'd*, 858 F.3d 71 (2d Cir. 2017); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 546 (S.D.N.Y. 2014) (describing indictment).

6

Upon registering an account with Silk Road, a user was assigned a Bitcoin address, and bitcoin sent to that address was credited to the user's Silk Road account. 1-SER-101.

The payments on Silk Road were processed through a so-called "tumbler" to obfuscate the connection between a buyer and a vendor through blockchain. ER-171–72; 1-SER-193. The "tumbler" worked by Silk Road sending an equivalent amount of bitcoin to the vendor as extracted from the buyer, but not the actual bitcoin the buyer used to fund his Silk Road Bitcoin address. 1-SER-185. Ulbricht also created an escrow system, whereby he held bitcoin of a customer until the purchased drugs or other merchandise arrived in expected condition. 1-SER-103.

Silk Road generated sales revenue totaling over 9.5 million bitcoin, and collected over 600,000 bitcoin in commissions from these sales. ER-171. Ulbricht, as the operator of Silk Road, had sole control over Silk Road's profits; his own user account received a steady stream of commission deposits of Bitcoin. 1-SER-102.

On May 6, 2012, Individual X hacked Silk Road and stole 70,411.46 bitcoin from Bitcoin addresses controlled by the website—a general pool of Silk Road bitcoin which were not from particular user accounts—which Individual X then sent to two Bitcoin wallet addresses that Individual X controlled. 1-SER-103,179.

On approximately April 9, 2013, Individual X sent 69,471.082201 bitcoin from those two Bitcoin addresses to the 1HQ3 Bitcoin address. 1-SER-103.

When Ulbricht became aware of Individual X's online identity, he threatened Individual X for return of the cryptocurrency, but Individual X did not comply. *Id.*

### C. Takedown of Silk Road and SDNY's October 2013 forfeiture action against bitcoin in wallets residing on Silk Road servers

On October 1, 2013, Ulbricht was arrested in San Francisco, California, and charged in the Southern District of New York ("SDNY") with narcotics trafficking conspiracy, computer hacking conspiracy, and money laundering conspiracy. 1-SER-103. Having located a server containing the corresponding authentication key for the Silk Road website on the Tor network, law enforcement also took down the Silk Road website and seized its servers, including all bitcoin contained in wallets residing within them. *Id.*; 1-SER-183.

The next day, the U.S. Attorney's Office for the SDNY sought to forfeit, pursuant to 18 U.S.C. § 981(a)(1)(A), the Silk Road hidden website, all bitcoin contained in wallet files residing on Silk Road servers, and all property traceable thereto. 1-SER-104; *see United States v. Any and All Assets of Silk Road, Including but Not Limited to the Silk Road Hidden Website and Any and All Bitcoins Contained in Wallet Files Filing on Silk Road Servers, including the Servers Assigned the Following Internet Protocol Addresses [] and All Property*

8

*Traceable Thereto* (herein, "*Any and All Assets of Silk Road*"), No. CV-13-06919 (S.D.N.Y.), at Dkt. 4.

On October 18 and November 8, 2013, the government published Notices of Forfeiture on the www.forfeiture.gov website. 1-SER-105 & n.5. Only Ulbricht filed a claim, and only for the bitcoin seized from the wallets hosted on his computer. 1-SER-106.

On January 15, 2014, the district court in SDNY entered a partial judgment by default and order of forfeiture of the Silk Road website and bitcoin traceable thereto. *Id.*

In February 2014, Ulbricht was indicted on federal charges, and the next year, he was convicted by a jury of seven counts including conspiracy to distribute narcotics and money-laundering. *Id.* He was sentenced to double life imprisonment plus forty years, without the possibility of parole, in connection with his ownership and operation of Silk Road. *Id.* In 2017, Ulbricht withdrew his claim to the bitcoin found on his computer, and that bitcoin was forfeited to the United States. *See Any and All Assets of Silk Road*, No. CV-13-06919 (S.D.N.Y.), at Dkt. 46.

### D. NDCA's November 2020 forfeiture action against bitcoin seized from 1HQ3, which has given rise to the instant appeal

#### 1. Individual X's consent to forfeiture

On November 3, 2020, Individual X signed a Consent and Agreement to Forfeiture with the U.S. Attorney's Office for the Northern District of California ("NDCA"), consenting to forfeit the approximately 69,370 bitcoin in 1HQ3. 1-SER-106. The United States then took custody of the Defendant Property from 1HQ3. ER-174. As widely reported, the publicly available blockchain reflected that 1HQ3's funds were at that time moved. ER-23.

#### 2. Government's complaint and notice

Two days later, the U.S. Attorney's Office for the NDCA filed a complaint to civilly forfeit the Defendant Property. CR-1. The government amended the complaint on November 27, and filed a notice on www.forfeiture.gov the same day. CR-3, 8, 9; 1-SER-6–7. This made any verified claim due 60 days later—that is, January 26, 2021—"[u]nless the court for good cause set[] a different time," under Rule G(5)(a)(ii)(B) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, of the Federal Rules of Civil Procedure ("Supplemental Rule G" or "Supp. R. G"). The government also provided direct notice to Ulbricht, which made any verified claim he wished to file due December 30, 2020. 1-SER-4.

10

The complaint explained how the government had identified Individual X as the owner of 1HQ3: A third-party Bitcoin attribution company had analyzed Bitcoin transactions executed by Silk Road and "observed 54 transactions that were sent from Bitcoin addresses controlled by Silk Road"—approximately 3,014 sending addresses, which were forfeited in the prosecution of Ulbricht, ER-26— "to two Bitcoin addresses: 1BADznNF3W1gi47R65MQs754KB7zTaGuYZ" ("1BAD") and "1BBqjKsYuLEUE9Y5WzdbzCtYzCiQgHqtPN" ("1BBq") "totaling 70,411.46 BTC." ER-172. The transferred amounts were in round amounts (*e.g.*, 2,500 bitcoin) atypical for Silk Road users, close in time, and "not noted in the Silk Road database as a vendor withdrawal or a Silk Road employee withdrawal" and so appeared to have been stolen from Silk Road. *Id.* The 1BAD and 1BBq Bitcoin addresses then transferred 69,471.082201 bitcoin to 1HQ3, which in turn, in April 2015, sent 101 bitcoin to BTC-e, an unlicensed cryptocurrency exchange that was subsequently indicted federally. ER-172–73. The remaining balance in 1HQ3 was essentially untouched until November 2020. ER-173. Meanwhile, there were several hard forks.[3] *Id.*

---

[3] A "hard fork" refers to a blockchain splitting into other, separate blockchains that support other cryptocurrencies. ER-173. In the hard forks of the Bitcoin blockchain, each address that held bitcoin, including 1HQ3, became an owner of an equivalent amount of Bitcoin Cash, Bitcoin Gold, and Bitcoin SV. *Id.*

As the government explained, "an investigation conducted by the Criminal Investigation Division of the Internal Revenue Service" ("IRS-CID") "and the U.S. Attorney's Office for the [NDCA]" determined that "Individual X, whose identity is known to the government" "was able to hack into Silk Road and gain unauthorized and illegal access to Silk Road and thereby steal the illicit cryptocurrency from Silk Road and move it into wallets that Individual X controlled." ER-173–74.

### 3. Timely claims and motions to intervene

In November 2020, Adesijuola Ogunjobi filed motions to intervene. *See* CR-14–16, 20. Ogunjobi's appeal of the district court's denials was deemed frivolous. CR-19, 24, 28–29, 41, 49, 66, 85.

On December 30, 2020, Ulbricht moved for an extension of time to file a notice of claim. CR-21, 46. On February 3, 2021, Ulbricht entered into a settlement agreement with the government, admitting that the Defendant Property was subject to forfeiture, and consenting to such forfeiture. 1-SER-107; CR-47.

On January 21, 2021, Caleb Bradberry filed a claim, which he later withdrew. CR-35, 48.

On January 25, 2021, Roman Hossain and Lucas E. Buckley, trustee of Gox Victim Bitcoin Trust, filed separate claims. CR-42, 43. The district court struck

both.  CR-104, 122.  Hossein's pending appeal is at C.A. No. 22-16085; Buckley's

is at C.A. No. 22-16248.  CR-123–25.

### 4.    Untimely claims and motion to intervene

It was not until March 16, 2021, that Battle Born—the Appellants here—

filed their verified claims and statements of interest.  ER-158–68.  Battle Born filed

their answers on April 5, 2021.  ER-140–57.  In its March 25, 2022, order, which

also struck Hossein's claim (see above at p. 12) and Ilija Matusko's claim (see

below), and denied Nobuaki Kobayashi's motion to intervene (see below), the

district court granted the government's motion to strike Battle Born's claims.  ER-

9–14.

On April 23, 2021, Kobayashi, duly appointed foreign representative in the

bankruptcy case of MtGox Co., Ltd., sought to intervene and have direct access to

the case.  CR-67.  Kobayashi did not appeal the district court's denial.  ER-193–96.

On July 2, 2021, Matusko filed a claim.  CR-87.  Matusko's pending appeals

from the court's order and judgment are at C.A. Nos. 22-15514 & 22-16349.  CR-

108–09, 129, 131.

### 5.    Battle Born's untimely claims and answers

According to the claim filed by First 100 and 1st One Hundred, they were

judgment creditors of a nondischargeable debt owed by Raymond Ngan, whom

they believed—but "require[d] additional information that is not currently public to

13

determine"—was or was associated with Individual X.  ER-159–60.  Accordingly, they believed themselves to be innocent owners of the Defendant Property.  *Id.*

In its claim, Battle Born Investments Company asserted that it had, on May 18, 2018, purchased "all assets of the bankruptcy estate" of Ngan, whom Battle Born believed—but "require[d] additional information, that is currently not publicly available, to determine"—was "himself, or . . . related to" Individual X.  ER-164–66.  Based "[u]pon a forensic review " of "electronic devices seized" from Ngan, Battle Born believed this bankruptcy estate to include "an interest in Defendant Property."  ER-164–65.  They therefore claimed to be the rightful owners of the 1HQ3 wallet and its bitcoin contents.  ER-158–68.

Battle Born's answers primarily denied the allegations in the government's amended complaint on the basis that they "lack[ed] sufficient information or knowledge to admit or deny the allegations."  ER-142–45, 151–55.  Battle Born "assert[ed] that Individual X could not consent to the transfer/forfeiture of the Defendant Property to the benefit of the United States because he had no property interest and/or rights in the Defendant Property at the time that he executed the consent agreement."  ER-145, 154.

### 6.  Battle Born's discussions with the government

Following the filing of their claims, Battle Born provided the government with additional information.  ER-34–72, 128–32; 1-SER-141 & n.9, 157–58.  The

government learned that Battle Born's purchase of Ngan's bankruptcy estate stemmed from Ngan's breach of his agreement to provide $160 million to business ventures of First 100 and 1st One Hundred. ER-80, 129. The two companies sued Ngan and obtained a $2 billion default judgment in Nevada state court. ER-80; *First 100 LLC v. Ngan*, No. A-16-738970-C (Nev. 8th Jud. Dist. – Clark Cty.), Dkt. 195 (default judgment). Ngan then filed for Chapter 7 bankruptcy in Nevada, seeking to discharge his judgment debt. ER-95; *In re Raymond Ngan*, No. 17-14166-BTB (Bankr. D. Nev.), Dkt. 1.

On May 14, 2018, the bankruptcy court issued an order approving the purchase by First 100 and 1st One Hundred, acting through Battle Born Investment Company, of Ngan's bankruptcy estate—including all disclosed and undisclosed property interests, wherever located, and by whomever held—from the trustee. ER-81, 98–105.

Subsequently, "to enforce" the $2 billion judgment, Battle Born spent hundreds of thousands of dollars chasing down and recovering assets (*e.g.*, a bank account containing around $8 million, an amount of a valuable rare copper isotope) that Ngan had failed to disclose in his bankruptcy filings. ER-74, 80–81, 83.

In August 2018, Ngan entered into a Memorandum of Understanding ("MOU") with Battle Born to settle his case and judgment for $75 million. ER-81. Battle Born paused its investigation into Ngan's assets in light of the MOU, but

15

after Ngan failed to fund the agreement, Battle Born resumed its discovery and collection efforts in January 2019. *Id.* As part of Battle Born's effort to identify assets, they obtained a court order requiring Ngan to produce his electronic devices. ER-81–82. "[I]n violation" of that order, "Ngan's associate . . . gave Mr. Ngan's laptop and cell phone to one of Mr. Ngan's business partners, Samuel Oliver, who in turn fled to Canada with the devices." ER-82–83.

Eventually, in April 2019, Battle Born was able to obtain these electronic devices, and review them forensically. 1-SER-133. This information showed Ngan and Oliver had called each other hundreds of times between late 2018 and mid-March 2019, and Oliver had "deleted fifty-four files from Mr. Ngan's devices over a two-day period." ER-82. "Notwithstanding" the deletion, "Claimants' analysts were able to determine" that between 2017 and 2019, Ngan engaged in multiple negotiations to sell "substantial quantities of Bitcoin." 1-SER-133 (citing ER-35–36). On December 19, 2018, Ngan sent a proposed contract for the sale of "a significant amount of Bitcoin" to one Patrick Ranzijin, going so far as to establish an escrow account in which "the purchasing party would wire funds" that would be returned if Ngan did not ensure timely delivery of the bitcoin. *Id.* When Ranzijin asked what Bitcoin wallet Ngan would use to execute the sales, Ngan sent "an image of the 1HQ3 page on the website, blockchain.com." *Id.*; ER-35–72, 74, 81–82. There was no evidence that the sale went through.

Battle Born had "planned" to compel Ngan to turn over the contents of 1HQ3 during a hearing in the bankruptcy action set for December 2019, at which Ngan was to testify "regarding his Bankruptcy Case, assets, destruction of evidence, and business dealings," but Ngan obtained a continuance, and then did not appear on the new date. ER-82–83, 96. As of the time they filed their claim against the Defendant Property, Battle Born believed Ngan had "[f]led"—they did not "know Mr. Ngan's whereabout, although they [we]re attempting to locate him."[4] 1-SER-133–34; ER-96.

### 7. The government's motion to strike Battle Born's claims

The government moved to strike Battle Born's claims for being untimely and because Battle Born lacked standing. 1-SER-66. The government submitted a declaration from IRS-CID Special Agent Jeremiah Haynie, ER-114–27, and a declaration from a government attorney, attaching documentation of discussions with Battle Born's counsel and documents Battle Born had provided the government (as discussed above at pp. 14–17). ER-128–39.

With respect to standing, the government argued that Battle Born had failed to do more than make conclusory or hearsay allegations regarding their actual possession of, control of, title to, or financial stake in the Defendant Property. 1-

---

[4] Ngan's bankruptcy case was closed February 28, 2020, and the court denied Ngan's request for discharge. 2-SER-285–86.

SER-73 (citing *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118–19 (9th Cir. 2004)). Battle Born's supposed "'proof' that Ngan owned or controlled 1HQ3" was "nothing more than a screenshot of a Bitcoin address available to the public on the top 10 richest Bitcoin address list," and did not demonstrate ownership or control. ER-120; 1-SER-84. Nor did Battle Born's other exhibits—text messages from Ngan's phone, purported agreements and draft documents to purchase and sell bitcoin, an email between Ngan and another concerning the purported sale of bitcoin, transcripts from Ngan's bankruptcy case—show that Ngan "ever possessed, owned, or controlled 1HQ3." 1-SER-84. In fact, it was known that there had been numerous scams involving false ownership claims of 1HQ3. ER-115–18.

Not only had Battle Born failed to show that Ngan was Individual X, Special Agent Haynie was definitive: "Raymond Ngan is not Individual X," and "[n]either are any of the 12 of Ngan's associates identified by Claimants' counsel." 1-SER-82–83 (citing ER-115).

The government also argued that "even if Ngan were involved in the theft of the Defendant Property," "a thief's title to stolen property is void ab initio and can never be part of his bankruptcy estate." 1-SER-66.

### 8. Battle Born's opposition

Battle Born argued that because that the government's motion to strike did not specify whether its motion was for judgment on the pleadings, to determine after a hearing, or for summary judgment, the district court "would be justified in denying the motion as procedurally improper." 1-SER-144. However, they conceded that the court "could" also just "elect" how to treat the government's motion. *Id*. They submitted five declarations from different attorneys representing them, and one from Jacky Lee, a data scientist, in support of their opposition. 1-SER-156–58; ER-34–113.

Battle Born asked the court to "[a]t the least," "defer ruling on the timeliness question" until Battle Born had been given "discovery to determine" whether the government had "conducted a sufficient investigation to" identify Battle Born as entities with a likely ownership interest such as to require providing them with direct notice. 1-SER-137–38, 144–45. Even if the government had not been required to provide Battle Born with direct notice, Battle Born asked the district court to overlook their untimeliness. 1-SER-137, 139–43. Battle Born claimed that they had only learned of the seizure of the Defendant Property from a November 6, 2020, article on January 28, 2021, two days after the claim-filing deadline. ER-74–75; 1-SER-135. And although Battle Born's bankruptcy counsel

apparently failed to ascertain the claim-filing deadline in follow up, Battle Born urged that they had acted diligently. ER-95–96; 1-SER-135–36.

With respect to the "standing issue," Battle Born argued that the government's motion should be, if entertained at all, construed as for judgment on the pleadings. 1-SER-145–46.

However, Battle Born also maintained that the information they had "already developed in support of their claim is exactly the type that should carry weight in the context of a virtual asset that, by its nature, lacks the traditional means of establishing ownership," and was sufficient to establish standing. 1-SER-130, 145–46. And they disputed that the government's evidence of Individual X's ownership of the bitcoin seized from 1HQ3 was conclusive or admissible. 1-SER-130–31; *see* 1-SER-148–49 (calling Special Agent Haynie's representation that the bitcoin in 1HQ3 was stolen by Individual X "far-fetched" and "conclusory"); ER-35–37, 15–17 (Jacky Lee declaration stating that bitcoin in 1HQ3 appeared to come from "58 wallets" and opining it "highly improbable for an individual to hack 58 wallets" "due to the fact that the private key used for accessing bitcoin wallets is very secure and cannot be easily guessed with modern computers" but surmising that four of the 58 "sources were likely transaction fees, as the transaction amount involved was less than one Bitcoin").

20

"[S]hould the Court choose to construe the motion as one for summary judgment," though, Battle Born asked the court to first allow discovery of essential facts in the government's exclusive possession, pursuant to Fed. R. Civ. P. 56(d)(2), such as "discovery relating to . . . the so far anonymous Individual X"—whom Battle Born now speculated was Russian hacker Nikita Kislitsin—as well as of evidence "from third parties, including Mr. Ngan and the individuals and entities to whom he tried to sell Bitcoin." 1-SER-145, 150–52; ER-83–85 (attorney declaration setting forth reasons for suspecting Kislitsin to be Individual X), 110–12 (attorney declaration detailing discovery Battle Born sought). Emphasizing the value of the bitcoin in 1HQ3 (which had been worth about $14.5 million at the time of Individual X's April 2013 theft, but was worth over $3 billion at the time Battle Born filed their verified claims in March 2021), Battle Born insisted that because "Claimants believe that *they* own this asset," they "should be given an opportunity to pursue further proof of their claim, so that, at an appropriate time, the matter can be decided on the merits." 1-SER-130, 134, 143–44. Battle Born argued that they should be permitted discovery not only to establish *that* Ngan owned 1HQ3, but as to "*how* Mr. Ngan obtained 1HQ3," so they could chase down speculations that Ngan was an innocent owner: "it *could* certainly have been from sources unrelated to Individual X or Silk Road," and

Ngan "*could* have been a bona fide purchaser of the Bitcoin even if it was unlawfully acquired originally." 1-SER-149 (emphases added).

"Even if the Court construes the [government's] motion as one for summary judgment *and* proceeds to adjudicate it without permitting discovery," Battle Born argued that their verified claim should not be struck. 1-SER-147.

### 9. Government's reply

The government submitted two additional declarations with its reply, a government attorney declaration with exhibits regarding the 2013 SDNY forfeiture action, 1-SER-159–76, and a second declaration by Special Agent Haynie, responding to some of the allegations made in Battle Born's submitted declarations. 1-SER-177–93. The government noted that the district court "can, and should consider information from the blockchain as it forms the basis for the Amended Complaint and is derived from the public record," and evaluation of "materials attached to complaints and public records" did not convert a motion to dismiss into a motion for summary judgment. ER-26 n.6 (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018); *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003)).

The government argued that there was no good cause to excuse Battle Born's untimeliness, and no basis for arguing that the government should have provided them with direct notice. ER-20–24 & n.2.

With respect to standing, the government dismissed Battle Born's "attempt to discredit the government's conclusion regarding the source of the Defendant Property as originating in Silk Road." ER-19. The government's conclusion was based on "data preserved in Silk Road's servers," blockchain analysis, Ulbricht's admissions in agreeing to the forfeiture, and Individual X, who had the private key to 1HQ3, thus enabling the government to transfer its bitcoin contents. ER-19–20 & n.3; ER-26–27; *see also* ER-21 (discussing "the extent of the government's investigation," which "revealed no connection whatsoever to Ngan or Claimants" and no individual other than Ulbricht "who would have a claim to the proceeds of Silk Road").

The government explained that Individual X was not Kislitsin, and offered to "disclose the identity of Individual X to the Court,"[5] but "*ex parte*, and in camera" due to the "real safety concerns" Individual X faced, "including threats . . . from Ulbricht." ER-20 & n.1.

The government also noted that Battle Born's discussion confused Bitcoin addresses and wallets with *transactions* from those addresses and wallets. ER-25.

The government urged the district court to reject Battle Born's plea for discovery because it wrongly "assume[d] the existence of a relationship between Ngan and Individual X" and sought items that did not exist. ER-32. Moreover,

---

[5] The district court did not take up the government's offer.

their "discovery plan makes it clear they intend to engage in protracted discovery about issues unrelated to this case," focusing on Ngan and his assets. *Id.*

### 10. The district court's order

On March 25, 2022, the district court granted the government's motion to strike Battle Born's claims, which the court found to be based on nothing "more than implausible speculation that any of the seized Bitcoin is their property." ER-6–7.

The district court also found Battle Born's claims were filed "[a]pproximately six weeks after the filing deadline," and did not excuse the delay or find that the deadline did not apply. ER-13–14.

The district court concluded that the motion to strike "must be granted" "[b]ecause" Battle Born had "not pleaded facts—as opposed to conclusions" in its claim (as opposed to subsequent briefing) "that plausibly put the 1HQ3 wallet into the bankruptcy estate it purchased." ER-14. "Although Battle Born insists the question of Ngan's ownership goes to the merits and is not properly resolved by a motion to strike under either summary judgment or judgment on the pleadings standards, it is Battle Born's burden to make out a colorable claim," and it had not met that burden. *Id.* Certainly, Ngan's conduct, in "sen[ding] an image of the 1HQ3 page on the website, blockchain.com, which is recognized means for Bitcoin users (and anyone else) to view the current contents and entire transactional history

of a given Bitcoin wallet" to a prospective buyer of Bitcoin could "reasonab[y]" be taken "as a representation by him that he owned the 1HQ3 wallet." ER-13. But Battle Born "now agree[d]" that Ngan was not Individual X. *Id.* And Battle Born offered nothing but "sheer speculation that Ngan may have had some association with Individual X" "to suggest how Ngan would have come into ownership of the Bitcoin in 1HQ3 wallet, much less lawful ownership that would have made the Bitcoin part of the bankruptcy estate." ER-13–14.

On August 16, 2022, the district court, having resolved all claims against the Defendant Property, entered the final judgment and order of forfeiture. ER-4–5.

## SUMMARY OF ARGUMENT

The district court correctly struck Battle Born's claims on the pleadings. Although the threshold for pleading a colorable ownership interest is low, Battle Born still failed to meet it. Their claims only speculated that perhaps Ngan had owned the Defendant Property at the time Battle Born acquired Ngan's bankruptcy estate, and did not unequivocally assert their ownership.

The district court's order was also justified as an order for summary judgment. Battle Born did not prove by a preponderance of the evidence that they had any ownership or possessory interest in the Defendant Property. Their evidence was merely that Ngan, proven to be unreliable, had represented to potential bitcoin buyers that Ngan had access to 1HQ3 and its contents. This

amounted to no more than a bare assertion, which was insufficient for Battle Born to survive a motion for summary judgment. Battle Born's discussions of the innocent-owner exception to forfeiture are not relevant to the initial, standing question addressed by the court's order, as they pertain to the merits of the forfeiture.

It was proper for the district court not to afford Battle Born a lengthy delay to conduct discovery. Battle Born was only entitled to such a continuance if it could specify facts it was likely to discover that would allow it to survive a motion for summary judgment. Battle Born did not specify such facts and show any likelihood of discovering them, but rather provided a litany of open-ended investigation that they wished to conduct.

This Court may also affirm the district court on the alternative basis that Battle Born's claims were untimely, and that the district court did not abuse its discretion in declining to excuse the tardiness.

This Court may also affirm on the alternative basis that, notwithstanding Battle Born's insistence to the contrary, even taking the record evidence in the light most favorable to Battle Born, Battle Born could not establish themselves to be innocent owners within the definition of 18 U.S.C. §. 983(d). Battle Born has never exercised dominion or control over 1HQ3, and bankruptcy trustees have no interest in property acquired through theft.

This Court should dismiss C.A. No. 22-15513. That appeal raises the same substantive questions as C.A. No. 22-16348, regarding whether the district court rightly struck Battle Born's claims to the Defendant Property. But C.A. No. 22-15513 requires this Court to decide whether an order striking a forfeiture claim is an independently appealable order. As Battle Born concede, this jurisdictional question is moot because the district court issued a final judgment. Should this Court nevertheless reach the jurisdictional question, it should find that an order granting a motion to strike is not subject to interlocutory appeal under the collateral-order doctrine. Such an order neither addresses a question separate from the merits of the underlying case, nor raises a separate question of high value which would evade review if not considered immediately.

## ARGUMENT

## I. THE DISTRICT COURT DID NOT ERR IN GRANTING THE GOVERNMENT'S MOTION TO STRIKE BATTLE BORN'S CLAIMS

### A. Standards of review

This Court reviews the district court's interpretation of the Federal Rules of Civil Procedure de novo, as does it whether a claimant has standing. *United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cnty.*, 787 F.3d 968, 972 (9th Cir. 2015).

This Court reviews de novo a district court's dismissal on the pleadings pursuant to Fed. R. Civ. P. 12(c), as it does a court's grant of summary judgment. *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 963 (9th Cir. 2010). This Court may affirm on any ground supported by the record even if it differs from the rationale of the district court. *Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023).

This Court reviews the district court's dismissal of a forfeiture claim for failure to comply with procedural requirements for abuse of discretion. *17 Coon Creek Rd.*, 787 F.3d at 972. "A district court abuses its discretion if it does not apply the correct legal standard, or if it fails to consider the factors relevant to the exercise of its discretion." *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1011–13 (9th Cir. 2013) (internal citations omitted).

This Court "ordinarily review[s]" a district court's discovery rulings for abuse of discretion. *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 677 (9th Cir. 2018). However, it affords de novo review if, as here, the district court implicitly denied a motion for discovery without expressly addressing it. *Id.*

## B. Legal principles

"Forfeitures serve a variety of purposes, but are designed primarily to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct." *United States v. Ursery*, 518 U.S. 267, 284 (1996). The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983, governs

all *in rem* civil forfeiture proceedings commenced on or after August 23, 2000. *17 Coon Creek Rd.*, 787 F.3d at 972. These forfeiture proceedings are also governed by Supplemental Rule G and the Federal Rules of Civil Procedure. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 634 (9th Cir. 2012).

Once the government has filed a verified *in rem* complaint, any person wishing to intervene and assert an interest in the property must file a verified claim and answer. *Id.* at 635 (citing 18 U.S.C. § 983(a)(4)(A), (B); Supp. R. G(5)).

It is the claimant's burden to establish Article III standing, which is necessary to "meet the case-or-controversy requirement." *Id.* at 637, 644. A claimant must also establish so-called "statutory standing" by meeting certain requirements of Supplemental Rule G. *17 Coon Creek Rd.*, 787 F.3d at 976; Supp. R. G(5) (requiring a verified claim to "state the claimant's interest in" the specific property claimed). Requiring a claimant to establish his relationship to the defendant property does not improperly shift the government's burden of proving the merits that the property is subject to forfeiture. *$133,420.00*, 672 F.3d at 644. Claimants can establish Article III standing "by showing that they have a colorable interest in the property, which includes an ownership interest or a possessory interest." *Id.* at 637 (internal quotations and citations omitted).

Fed. R. Civ. P. 26(a)(1)(B)(ii) exempts the government from initial disclosures in a forfeiture action *in rem* arising from a federal statute. Otherwise,

29

Rule 26(a)(3) governs pretrial disclosures, and Rule 26(b) provides for discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

"Unlike in typical civil proceedings, the government may commence limited discovery immediately after a verified claim is filed," without court leave, to gather information bearing on the claimant's standing, "to test the veracity" of the claimant's interest in the property, as broadly asserted in the verified claim. *$133,420.00*, 672 F.3d at 634 (citing Supp. R. G advisory committee's note (subdivision (6)), 642–43. "The general civil discovery rules of the Federal Rules of Civil Procedure otherwise apply." *Id.* at 634 (citing Supp. R. G(1)).

"At any time before trial, the government may move to strike a claim or answer" for its failure to comply with Supplemental Rule G(5), or for the claimant's failure to respond to special interrogatories pursuant to Supplemental Rule G(6), or "because the claimant lacks standing." Supp. R. G(8)(c)(i).

Such a motion "must be decided before any motion by the claimant to dismiss the action" and "*may be presented* as a motion for judgment on the

30

pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." Supp. R. G(5)(c)(ii)(B) (emphasis added).

"If the claim shows facts that would support standing, those facts can be tested by a motion for summary judgment." Supp. R. G advisory committee's note (subdivision (8), Paragraph (c)(ii)). "If material facts are disputed, precluding a grant of summary judgment, the court may hold an evidentiary hearing." *Id.* "The claimant has the burden to establish claim standing at a hearing; procedure on a government summary judgment motion reflects this allocation of the burden." *Id.*

Federal Rule of Civil Procedure 56 governs summary judgment. "A party asserting that a fact cannot be or is genuinely disputed must assert the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the court "may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). A court may respond to a party's failure "to properly support an assertion of fact or . . . to properly address another party's

assertion of fact as required by Rule 56(c)" by (1) giving an opportunity to properly support or address the fact; (2) considering the fact undisputed for purposes of the motion; (3) granting summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e).

### C. Because Battle Born failed to unequivocally claim ownership to the Defendant Property, the district court was right to strike their claims on the pleadings

As Battle Born appear to concede, the district court's order granted the government's motion to strike on the basis that Battle Born failed to properly plead standing.[6] AOB 36. This Court should affirm because, although the threshold for pleading standing is low, Battle Born failed to meet it in their claims.

---

[6] Battle Born complain that the government did not specify whether its motion to strike was being presented as a motion for judgment on the pleadings or for summary judgment. AOB 16, 36. Supplemental Rule G8(c)(ii) does not make the presentation of the motion mandatory; its "may" language is descriptive or permissive. In any event, Battle Born do not appear to argue that any error in form was fatal, or that the district court abused its discretion by considering the government's motion as filed. *$11,500.00*, 710 F.3d at 1012 (explaining that courts have discretion to overlook failure to conform to requirements of forfeiture claim rules). Battle Born state that the government's briefing suggests that the government "intended to file a Rule 12(c) motion, not a summary-judgment motion," AOB 37, but fail to articulate a claim for relief from this Court on that basis. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim."); *accord Miskey v. Kijakazi*, 33 F.4th 565, 573 n.8 (9th Cir. 2022).

"[A] claimant's unequivocal assertion of an ownership interest in the property is sufficient by itself to establish standing" "[a]t the motion to dismiss stage." *$133,420.00*, 672 F.3d at 638. But "[i]f a claim fails on its face to show facts that support claim standing, the claim can be dismissed by judgment on the pleadings." Supp. R. G advisory committee's note (subdivision (8), Paragraph (c)(ii)); *see, e.g.*, *United States v. $31,000.00 in U.S. Currency*, 872 F.3d 342, 351 (6th Cir. 2017) (finding "clear allegation of ownership that satisfied Article III" where there was not merely statement by claimant "that he owned the cash," but "where the government alleged that it took a bundle of cash from a claimant's suitcase").

Here, Battle Born's claims of ownership of the bitcoin in 1HQ3 did not establish standing. Although Battle Born "claim[ed] an interest" in the Defendant Property, they stopped short of stating that they actually owned the Defendant Property, as opposed to stating that they believed that they might. ER-159–60.

First 100 and 1ˢᵗ One Hundred's claim stated that "*insofar* as Claimants can show they are material Judgment Creditors of Individual X or of a person associated with Individual X," they were "innocent 'owners,' within the meaning of 18 USC section 983(d)(6) and 28 Code of Federal Regulations section 9.2, pursuant to 18 USC section 983(d)(3)." ER-160 (emphasis added). But First One Hundred and 1ˢᵗ One Hundred did not indicate that they could make this showing.

Rather, they "require[d] additional information that is currently not publicly available to determine if the Judgment Debtor is, in fact, Individual X in the instant matter, or a person associated with Individual X," who "Claimants are informed and believe" had consented to transfer the Defendant Property to the government in 2020. ER-159–60.

Likewise, Battle Born Investments Company's claim was premised on the supposition that Ngan—whose bankruptcy estate it owned—was or was associated with Individual X. ER-164. But "Claimant requires additional information, that is currently not publicly available, to determine if [Ngan] is, in fact, Individual X himself, or an associated party." ER-166.

Thus, Battle Born did not unequivocally assert ownership or even possession.

Even if Ngan was Individual X, Battle Born would not have had an ownership interest in the Defendant Property. First 100 and 1st One Hundred did not claim that their judgment against Ngan was secured by any particular asset. *See United States v. Nava*, 404 F.3d 1119, 1128–29 (9th Cir. 2005) (legal title determined by state law); Nev. Rev. Stat. § 31.010 ("[T]he plaintiff … may apply to the court for an order directing the clerk to issue a writ of attachment and thereby cause the property of the defendant to be attached as security for the satisfaction of any judgment that may be recovered…."). As such, they were

34

general creditors, and this Court has been unequivocal in holding that "general creditors cannot claim an interest in any particular asset that makes up the debtor's estate," and therefore "do not have standing to challenge the civil forfeiture of their debtors' property." *United States v. $20,193.39 U.S. Currency*, 16 F.3d 344, 346 (9th Cir. 1994); *see also United States v. Hernandez-Escobar*, 911 F.3d 952, 959 (9th Cir. 2018). Indeed, 18 U.S.C. § 983(d)(6)(B)(i) specifically excludes from its definition of "owner" a person "with only a general unsecured interest in, or claim against, the property or estate of another."

As for Battle Born Investments Company, it did not own 1HQ3 because even if 1HQ3 were in Ngan's bankruptcy estate, 1HQ3 was in a constructive trust for the benefit of Silk Road and Ulbricht. Battle Born did not contest the government's complaint in the way it accounted for Individual X's[7] funding 1HQ3 with bitcoin stolen from Silk Road. Under Nevada law, stolen property is considered to be in a constructive trust, "by which the holder of legal title to property is deemed to be a trustee of that property for the benefit of another who in good conscience is entitled to it." *Namow Corp. v. Egger*, 99 Nev. 590, 592 (Nev. 1983). It would be unconscionable to allow the thief to enjoy beneficial interest of the property. *In re Unicom Computer Corp.*, 13 F.3d 321, 325 (9th Cir. 1994); *In*

---

[7] This is distinct from Battle Born's complaint that the government would not publicly disclose *who* Individual X is. *See*, *e.g.*, AOB 57.

*re N. Am. Coin & Currency, Ltd.*, 767 F.2d 1573, 1575–76 (9th Cir.), *amended*, 774 F.2d 1390 (9th Cir. 1985). Ulbricht was the one with a property interest in the bitcoin seized from 1HQ3, which is why he was provided direct notice of the government's forfeiture action.

Because Battle Born did not establish standing in their claims, the district court was entitled to dismiss their claims by judgment on the pleadings. Supp. R. G advisory committee's note (subdivision (8), Paragraph (c)(ii)). That is precisely what the district court did, rightly characterizing what Battle Born had "pleaded" as nothing more than "speculation," and lacking in factual assertions. ER-6–7, 14.

The district court's concise order did lightly address Battle Born's evidence (absent from their claims, but submitted in the course of litigating the government's motion to strike) that Ngan had sent an image of the 1HQ3 page on the blockchain website to a prospective buyer of bitcoin, noting that this could reasonably be taken as "a representation by him that he owned the 1HQ3 wallet." ER-13. But Battle Born never asked to amend their claims to include Ngan's conduct as assertion of ownership. Nothing in the district court's order suggests that the district court construed the claims as amended before striking them.

Moreover, that the district court may have acknowledged some of the evidence submitted in the litigation of the government's motion to strike did not mean that consideration of this evidence was necessary to its decision, converting

36

the court's analysis to one of summary judgment. *See* ER-26 n.6; citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018); *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003)).

Battle Born incorrectly characterize the district court as premising its order striking Battle Born's claims on the adoption of the government's allegations about Individual X and Silk Road. AOB 42. In fact, it is Battle Born's claims that were premised on the government's complaint; it was Battle Born's belief that Ngan might be Individual X, and that he had relinquished ownership of 1HQ3 through the bankruptcy proceeding, and so could no longer validly consent to the government's forfeiture action.

But even if the district court considered, improperly, the evidence presented through the litigation of the motion to strike, this Court may affirm because a de novo review limited to the four corners of Battle Born's claims shows that Battle Born had failed to meet its "burden to make out a colorable claim." ER-14.

### D. Dismissal by summary judgment for lack of standing was also justified

Even if Battle Born had met the "low threshold for claimants initially to establish statutory standing," the undisputed evidence submitted by the government and Battle Born made clear that Battle Born did not have standing and warranted summary judgment for the government on this basis. *United States v. $284,950.00 in U.S. Currency*, 933 F.3d 971, 973 (8th Cir. 2019) ("If a claimant's

assertions of ownership in his initial claim are undermined by his answers to the special interrogatories, his standing could then be challenged on a motion for summary judgment, where the claimant would have to 'carry the burden of establishing standing by a preponderance of the evidence.'" (quoting Supp. R. G(8)(c)).

"[T]o withstand a motion for summary judgment on the ground that the [claimant] lacks standing," the claimant "cannot rely on mere allegations but rather must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *$133,420.00*, 672 F.3d at 638 (internal quotations and citation omitted). Although the evidence must be viewed in the light most favorable to the nonmoving party, *Opara*, 57 F.4th at 721, "'a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.'" *$133,420.00*, 672 F.3d at 638 (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). The district court will grant summary judgment for the government unless there is evidence on which a fair-minded jury could reasonably find that the claimant has an ownership or possessory interest in the defendant property, that is, unless there is a genuine issue for trial. *Id.* Such evidence may be simply a claim of ownership, combined with the fact that the property claimed was actually seized from the claimant's possession. *Id.*

38

As the district court pointed out, Battle Born "now agree[d]" that Ngan was not Individual X—which had been the entire lynchpin of Battle Born's claims. ER-13. The government submitted evidence from Special Agent Jeremiah Haynie declaring that he had "personally investigated and spoken with Individual X" and that neither Ngan nor the "twelve names who Claimants believe may be associates and/or affiliates of Raymond Ngan" was Individual X. ER-115 at ¶ 4–5. Battle Born submitted no evidence to the contrary to place the fact in dispute.[8]

Battle Born nevertheless insisted, post-claim, that Ngan could still be an owner of the bitcoin in the 1HQ3 wallet, and that perhaps Individual X, despite being able to grant access to the wallet's contents to the government for seizure, was not an owner (or the sole owner), and that perhaps the government had simply fabricated the recitals in its complaint. 1-SER-148–49. But the evidence, even viewed in the light most favorable to Battle Born, still did not show by a preponderance of the evidence that Battle Born had standing to contest forfeiture of the Defendant Property. On the contrary, the uncontested evidence undermined Battle Born's claim that Ngan owned the bitcoin in 1HQ3 wallet.

---

[8] Battle Born supplies no support for their position that their answers' blanket denials of the government's complaint allegations sufficed to place material facts in genuine dispute during summary judgment proceedings, particularly, where Battle Born later submitted declarations that did not contest certain facts offered by the government's declarations. AOB 43.

As the district court noted, Ngan's conduct, in "sen[ding] an image of the 1HQ3 page on the website, blockchain.com, which is recognized means for Bitcoin users (and anyone else) to view the current contents and entire transactional history of a given Bitcoin wallet" to a prospective buyer of Bitcoin could "reasonabl[y]" be taken "as a representation by him that he owned the 1HQ3 wallet." ER-13; AOB 62–63. But Ngan had, at bottom, merely implied to a potential buyer that he had access to the bitcoin in 1HQ3. 1-SER-82–85, 133. And, however involved, elaborate, or emphatic, Ngan's representation remained nothing more than just that: a bare assertion, and not even an assertion made under penalty of perjury, as would be required in a verified claim (which itself, without supporting evidence, would also be insufficient to survive a motion for summary judgment). *Compare United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in United States Currency*, 859 F.3d 1085, 1092 (D.C. Cir. 2017) (claimants not only asserted ownership but gave "extensive sworn testimony" "detailing how they amassed the money, why they transported it to North Carolina, and how it ended up in Peter's hands"). Of course, any inferences based on Ngan's statements depend on their truthfulness, and Battle Born cannot but acknowledge that Ngan was thoroughly unreliable.[9] ER-80–83 (Ngan breached contract to provide $160

---

[9] First 100 and 1st One Hundred's complaint in Ngan's bankruptcy case accused Ngan of "misstat[ing] the source of funds for the funding to be provided" to the companies, and giving "false" "testimony" at his meeting on creditors. 2-SER-

million, did not disclose assets in bankruptcy, did not fund $75 million settle
agreement, violated court order regarding electronic devices).

Beyond Ngan's unsworn representations, Battle Born had no evidence that
Ngan ever actually had access or possession of the Defendant Property, much less
ownership. *See United States v. $8,440,190.00 in U.S. Currency*, 719 F.3d 49, 52,
58–59 (1st Cir. 2013) (finding summary judgment for lack of standing appropriate
where claimant's evidence was merely assertion of ownership of bales of money
worth $8 million that had been thrown overboard, which was "contradicted" by
"uncontradicted evidence" in the record). Battle Born had no evidence that Ngan
ever transferred bitcoin to or from 1HQ3, or that he successfully sold any of
1HQ3's contents. Indeed, the government submitted evidence of numerous
attempts by various individuals claiming ownership of 1HQ3, which was famous
because of its high value, to obtain money. ER-115–18 at ¶¶ 6–9. A "bare
assertion of an ownership or possessory interest, in the absence of some other
evidence, is not enough" to survive a summary judgment motion. *$133,420.00*,
672 F.3d at 638.

---

225–27. To the extent that this Court finds this relevant, it may take judicial notice
of filings in state courts. *United States ex rel. Robinson Rancheria Citizens
Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).

In fact, although Ngan may have *tried* to sell bitcoin between 2017 and 2019, discussing sales for thousands of bitcoin, *see*, *e.g.*, ER-35–72, uncontested evidence showed that 1HQ3's balance remained largely the same between the time it was funded on approximately April 9, 2013, with "69,471.082201 BTC" and the government's seizure in November 2020, when its balance was "69,370 BTC."[10] ER-115 at ¶¶ 3, 6. Battle Born put forth no evidence that Ngan ever possessed or accessed 1HQ3.

Other evidence is also inconsistent with Ngan owning 1HQ3. First, Ngan entered into an MOU that would have allowed him to discharge his $2 billion debt for $75 million in August 2018. ER-80–81. If Ngan had owned 1HQ3, he could have funded the settlement with a fraction of the bitcoin and remained a billionaire. But Ngan did not fund the agreement, which was what led Battle Born to investigate his electronic devices and discover Ngan's representations regarding 1HQ3, and what allowed the government to subsequently seize the full balance of

---

[10] The Amended Complaint alleged that 1HQ3 sent 101 bitcoin to BTC-e on approximately April 23, 2015, but no one transferred bitcoin out of 1HQ3 between April 2015 and when it was seized in November 2020. ER-173. Although Battle Born's answer denied this, it did so only on the basis that it "lack[ed] sufficient information or knowledge to admit or deny the allegations." ER-153. Subsequently, Battle Born never submitted evidence contradicting these allegations, which it could have verified by consulting blockchain. Jacky Lee's declaration, submitted on behalf of Battle Born, ER-36–37, had nothing to say about the matter.

1HQ3.  Second, if Ngan was trying to keep the bitcoin in 1HQ3 for himself, it is striking that he did not have its contents transferred during the bankruptcy proceeding once he knew Battle Born was after it.  Third, Ngan's failure to resurface after the government seized the bitcoin from 1HQ3, and his failure to file his own verified claim, given the high value of the Defendant Property, strongly indicate that Ngan never owned 1HQ3.

Battle Born assert that it is always exceedingly difficult to show ownership or possession of bitcoin.  AOB 64–65.  The record here indicates otherwise.  Special Agent Haynie explained in his declarations that a digital signature from a Bitcoin address is proof that someone controls the private key to that address and owns or possesses it.  ER-118–20; 1-SER-178–79, 181.  It is, undoubtedly, difficult for Battle Born to demonstrate that Ngan owned the bitcoin in 1HQ3 (because he did not), but that does not mean that it should not be required to do so to establish standing.

Battle Born argue that the district court impermissibly relied on the government's evidence to strike their claim.  AOB 59.  The district court order in fact does not address the government's evidence at all,[11] focusing exclusively on Battle Born's verified claim and subsequent assertions regarding the evidence they

---

[11]  Battle Born's charge that Special Agent Haynie's declarations are hearsay, AOB 59–60 & n.14, is peculiar, since Haynie personally investigated Individual X and conducted blockchain analysis of 1HQ3.  ER-114–15; 1-SER-178.

found on Ngan's electronic devices. ER-13–14. The court did not require Battle Born to show some association with Individual X, AOB 55, 59, but simply observed that Battle Born's only explanation for "how Ngan would have come into ownership of the Bitcoin in 1HQ3 wallet, much less lawful ownership that would have made the Bitcoin part of the bankruptcy estate" was "sheer speculation that Ngan may have had some association with Individual X." ER-13–14. It was Battle Born that theorized, first (in their verified claims) that Ngan was Individual X, and then (in their opposition to the government's motion to strike) that a Russian hacker Nikita Kislitsin was Individual X. ER-83, 165.

Battle Born devote a substantial amount of their Opening Brief to arguing that they are innocent owners under 18 U.S.C. § 983(d), whose interest in property may not be forfeited. AOB 44–55; *see United States v. Hooper*, 229 F.3d 818, 822 (9th Cir. 2000) (explaining that 18 U.S.C. § 983(d) "den[ies] relief to transferees of proceeds of the crime causing forfeiture, unless those transferees are bona fide purchasers for value without notice"). But this puts the cart before the horse. Whether Battle Born are innocent owners whose interests in 1HQ3 should not be forfeited under 18 U.S.C. § 983(d)(1) goes to the merits,[12] *United States v. One*

---

[12] Although Battle Born noted that the district court did not "conduct any further proceedings to require the Government to meet its statutory obligation to prove" that the Defendant Property was subject to forfeiture, AOB 31, Battle Born do not challenge the validity of the forfeiture order in their opening brief, AOB 16–19,

44

*Lincoln Navigator 1998*, 328 F.3d 1011, 1014 (8th Cir. 2003), and the district court appropriately did not reach this in its order.

The controlling issue raised in the instant appeal is whether Battle Born had standing to challenge the government's forfeiture claim at all, not the merits of the forfeiture judgment. Battle Born did not have standing because they did not prove an ownership interest in the bitcoin in 1HQ3 by a preponderance of the evidence.

Because Battle Born could not carry their burden of showing that they could prove by a preponderance of the evidence that Ngan had owned 1HQ3, which was the only basis for Battle Born's ownership, the district court was entitled to grant summary judgment as to Battle Born's claims.

### E. The district court did not err in striking Battle Born's claims for lack of standing without allowing them to first conduct unwarranted and protracted discovery

Battle Born is wrong in stating that "if the district court was inclined to treat the Government's motion as one for summary judgment and inclined to grant the motion, the court should at least give Claimants an opportunity to take discovery under Rule 56(d) to gather facts relevant to their Article III standing." AOB 65. The district court did not err in not allowing discovery. *See Stevens*, 899 F.3d at

---

and therefore waive such argument. *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006).

676 (treating district court's failure to specifically address a request for discovery as an implicit denial).

A party requesting continuance of a decision on a motion for summary judgment must identify by affidavit the specific facts that discovery would reveal, must explain why those facts are essential, why they would preclude summary judgment, and that they would most likely discover those facts. *Sec. & Exch. Comm'n v. Stein*, 906 F.3d 823, 833 (9th Cir. 2018).

Battle Born failed to satisfy these requirements. Battle Born's discovery requests went well beyond the narrow issue presented by the government's motion to strike on the basis that Battle Born lacked standing. Battle Born sought to conduct discovery "*relevant*" "*to ownership of the 1HQ3 wallet*," "*to Claimants' and Mr. Ngan's 'innocent owner' defense,*" "*to whether the Defendant Property is subject to forfeiture*." ER-110–12. Battle Born sought numerous items of discovery, including deposition of Special Agent Haynie to test his allegations regarding Individual X, and document requests for and deposition of Ngan and the people to whom he tried to sell bitcoin. *Id.*; 1-SER-150–52.

Battle Born did not enumerate, as necessary, "'specific facts' they hoped to elicit from further discovery," or provide any basis to believe such facts would be discovery, only general requests. *Stevens*, 899 F.3d at 679 (internal citation omitted). Nor did Battle Born show that the discovery was likely to be favorable

to them, as was necessary to justify what would have to be an exceedingly lengthy continuance of the government's motion to strike Battle Born's claims. The discovery might well confirm that Ngan had no relationship to Individual X and had no ownership of 1HQ3. The evidence Battle Born "sought was 'the object of mere speculation,' which is insufficient to satisfy the rule" "allow[ing] for additional discovery pursuant to Federal Rule of Civil Procedure 56(d)." *Stein*, 906 F.3d at 833 (internal citation omitted).

### F. Alternatively, this Court may affirm the district court's order striking Battle Born's claims because they were untimely

The district court found that Battle Born's claims were filed "[a]pproximately six weeks after the filing deadline," and did not excuse the delay or find that the deadline did not apply. ER-13–14. The government argued untimeliness in the district court and maintains this argument on appeal. This Court may affirm the district court's striking of Battle Born's claims on this basis.

This Court has noted that standing to contest a forfeiture action can be conditioned on strict compliance with filing requirements. *17 Coon Creek Rd.*, 787 F.3d at 974. Under Supplemental Rule G(a)(2)(B), all claims to the bitcoin seized from 1HQ3—except for those by individuals who had received direct notice— were due by January 26, 2021. Battle Born did not file their claims until March 16, 2021. CR-62. It is undisputed that the district court did not retroactively extend Battle Born's filing deadline, despite Battle Born's vociferous arguments that any

47

untimeliness should be excused, or that the court should at least grant discovery on the matter.

The district court's decision not to exercise its discretion to excuse Battle Born's untimeliness was well-justified. A court should only exercise its discretion to grant additional time "where the goals underlying the time restriction and the verification requirement are not thwarted." *United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1435–36 (9th Cir. 1985). And the factors this Court has considered to determine whether a district court should excuse lateness of a claim support the district court's decision not to excuse the lateness of Battle Born's claim. *$100,348.00*, 354 F.3d at 1117–18. Battle Born believed Ngan to be connected to 1HQ3 by December 2019. They had an understanding of the enormity of assets involved, knew that it was possible to track the wallet, and had the ability and willingness to deploy substantial resources in pursuit of 1HQ3. Had they done so through blockchain or keeping up with the news, they would have known exactly when the bitcoin in 1HQ3 was seized by the government, and been on notice of the forfeiture proceeding. Their delay was not due to illness or death, but negligence. ER-74–77 (discussing public record of transfer from 1HQ3, and news report on "Record $1 billion worth of bitcoin linked to the Silk Road seized y U.S. government"); 1-SER-135 & n.4. Battle Born had not expended resources preparing for trial. Battle Born was represented by attorneys. And the government

48

was prejudiced by the late filing, in the sense that delayed claims delayed the resolution of its forfeiture action against the Defendant Property, and with the unpredictability of the schedule, increased the risk that the Defendant Property's value would plummet, given cryptocurrency's volatility.

The government also did not encourage any delay, but properly posted notice of the forfeiture. Battle Born suggested that perhaps discovery would show that the government was required to, but failed to, provide him with direct notice. There is no basis for this speculation. Supplemental Rule G(4)(b)(i) requires the government to provide direct notice to "any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim under Rule (5)(a)(ii)(B)"—here, January 26, 2021. Supp. R. G(4)(a), (5)(a)(ii). There is no evidence that the government had any reason to believe that Battle Born was a potential claimant prior to January 26, 2021, or even afterwards, for that matter. Special Agent Haynie declared under oath that Individual X was not Ngan nor any of the numerous people Battle Born speculated. Moreover, Supplemental Rule G(4)(b)(i) does not impose upon the government a duty to investigate and unearth potential claimants, but rather only a duty to inform those "who reasonably appear[]" to be potential claimants based "on the facts known to the government" before a particular deadline.

49

**G.      Alternatively, this Court may affirm because Battle Born could not show themselves to be innocent owners**

Although this Court should affirm on the district court's reasoning, it may affirm on any ground supported by the record.  Here, it was plain that, even if Battle Born established standing, their claims to the Defendant Property were meritless.  And so, regardless of whether the government could satisfy its burden to forfeit the Defendant Property, it was clear Battle Born had no right to it.

One cannot be an innocent owner of property without owning it.  *United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo-Prop Aircraft, Venezuelan Registration No. YV219T, Serial UC118*, 619 F.3d 1275, 1277 (11th Cir. 2010) ("For a claimant to prove, under CAFRA, that its property should not be forfeited because it is an innocent owner, the claimant must establish, by a preponderance of the evidence, that it is both innocent, and an owner." (citing 18 U.S.C. § 983(d)).  Here, even if Ngan actually owned 1HQ3 at the time Battle Born acquired Ngan's bankruptcy estate (including all disclosed and undisclosed property interests), the evidence Battle Born presented, taken in the light most favorable to them, would still not show that *they* qualify as owners within the meaning of 18 U.S.C. § 983(d)(6).  Section 983(d)(6)(B)(iii) defines an "owner" to exclude someone "who exercises no dominion or control over the property." Battle Born have plainly never exercised dominion or control over 1HQ3.  *See One 1990 Beechcraft*, 619 F.3d at 1279 (affirming finding that company with title to

50

airplane was not owner where it exercised no dominion or control over the airplane).

Moreover, Battle Born does not appear to contest that the contents of 1HQ3 originated from theft of Silk Road. Bankruptcy trustees have been held to have no interest in property acquired through fraudulent means. *In re N. Am. Coin & Currency, Ltd.*, 767 F.2d at 1575–76.

It is also at least debatable whether Battle Born was a bona fide purchaser for value without notice of 1HQ3, as necessary to qualify as an innocent owner under 18 U.S.C. § 983(d)(3)(A). There is no evidence that, at the time Battle Born purchased Ngan's bankruptcy estate, Battle Born even contemplated that the estate included 1HQ3,[13] and Battle Born only discovered a possible link between Ngan and 1HQ3 well after making the purchase. To the extent that Battle Born acquired title to 1HQ3, it was essentially as a gratuitous transferee. *United States v. Real Prop., Buildings, Appurtenances & Improvements at 221 Dana Ave., Hyde Park, Massachusetts*, 261 F.3d 65, 72 (1st Cir. 2001) (explaining that "a gratuitous transferee would have no protection against a pre-transfer crime for which

---

[13] The bankruptcy trustee moved to sell Ngan's bankruptcy estate to Battle Born for $10,000, where he deemed the estate only worth $1,750. 2-SER-196–200. The trustee summarized the "dubious asset leads" Battle Born was paying to pursue as related to "bank accounts, securities accounts, and/or . . . foreign companies, in places such as Bahrain, Oman, and Hong Kong." 2-SER-198, 200. *See ex rel. Robinson Rancheria Citizens Council*, 971 F.2d at 248 (judicial notice).

51

forfeiture was appropriate"). CAFRA's innocent owner exception is aimed at protecting the interests of a person who purchases property with no idea that the property is forfeitable to the government. *See One 1990 Beechcraft*, 619 F.3d at 1277–79. It is not intended to create a windfall for a person who, in purchasing property, had no idea that the property included a specific asset that would otherwise be forfeited to the government, and who never relied on or used the asset. CAFRA's innocent-owner exception protects, for example, a person who buys a building, without knowing that it was a stash house, from losing that building to forfeiture. It does not, or should not, protect the same person from losing to forfeiture stocks used in laundering proceeds from the stash house, where the person happens across stock certificates in the floorboards while renovating.

## II. PRIOR TO THE ENTRY OF JUDGMENT, THIS COURT LACKED JURISDICTION TO CONSIDER APPEAL OF THE ORDER STRIKING BATTLE BORN'S CLAIMS, BUT THAT ISSUE IS MOOT AND THIS COURT SHOULD DISMISS C.A. NO. 22-15513

### A. Standard of review

This Court reviews de novo whether it has jurisdiction over an interlocutory appeal. *Pauluk v. Savage*, 836 F.3d 1117, 1120 (9th Cir. 2016).

### B. The jurisdictional issue is moot

As Battle Borns concedes, AOB 7, 14, 30 n.5, because the district court has issued a final judgment, which Battle Born have appealed, whether this Court had jurisdiction to entertain appeal of the court's pre-judgment order striking Battle

52

Born's claims is moot.  *See*, *e.g.*, *Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 701 (9th Cir. 2018) ("After the district court rendered its decision on the merits and final judgment, the en banc panel dismissed the interlocutory appeals of the denied preliminary injunctions as moot."), *on reh'g en banc sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020), *rev'd and remanded sub nom. Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021). This Court should therefore dismiss the appeal under C.A. No. 22-15513 to "avoid advisory opinions on abstract propositions of law."  *Hall v. Beals*, 396 U.S. 45, 48 (1969) (per curiam).  Battle Born has not argued for an exception to the mootness doctrine, and has, accordingly, waived any such argument.  *Romm*, 455 F.3d at 997.

> **C.** **Should the Court reach the question, it should conclude that it has no jurisdiction over a pre-judgment ordering striking a claim to property in a forfeiture proceeding, where the district court has not certified the order for immediate appeal under Fed. R. Civ. P. 54(b)**

Should this Court, nevertheless, reach the question of whether it has jurisdiction over the appeal of a pre-judgment order striking a verified claim to Defendant Property in a forfeiture action, it should conclude that it does not.

Under Fed. R. Civ. P. 54(b), the district court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties if the court expressly determines that there is no just reason for delay.  But where there is no

final judgment, where "[a] matter remains open, unfinished or inconclusive, there may be no intrusion by appeal." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (citing 28 U.S.C. §§ 1291, 1292). This Court has no jurisdiction over district court orders that are but a "step toward final disposition of the merits of the case" and that will "be merged in final judgment." *Id.* The Court has jurisdiction only over final judgments and "that small class" of orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.*

Following the Supreme Court's exhortation, this Court has maintained that the collateral-order doctrine is and "must remain a narrow exception." *SolarCity Corp. v. Salt River Project Agric. Improvement & Power Dist.*, 859 F.3d 720, 724 (9th Cir. 2017) (citing *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 106 (2009)). An interlocutory order may be appealed only if it is (1) conclusive, (2) addresses a question separate from the merits of the underlying case, and (3) raises a separate question of high value which would evade review if not considered immediately. *Id.*

The district court's order striking Battle Born's claim to the Defendant Property does not satisfy the second of these three requirements. Whether the

54

district court ordered the Defendant Property forfeited, and how much to the government, as opposed to claimants, is inseparable from whether the district court should have allowed any of the claims—including Battle Born's—to proceed.

The district court's order striking a claim is simply "a "step toward final disposition of the merits of the case" that will "be merged in final judgment." *Cohen*, 337 U.S. at 546; *see United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 635 (9th Cir. 2012) (discussing procedure). The district court must decide such a motion to strike before considering that claimant's motion to dismiss the forfeiture action. Supp. R. G(8)(c). And finding that a claimant has failed to establish a colorable interest in the defendant property is connected to the merits question of whether the defendant property may be forfeited. Such determination is reflected in the court's final forfeiture order—the amount forfeited to the government, and the amount returned to any rightful innocent owners. Because the district court's order striking Battle Born's claim was not sufficiently separate from the final forfeiture order, the order does not belong in the small class of collateral orders subject to immediate appeal.

The district court's order striking Battle Born's claim to the Defendant Property also does not meet the third of the requirements for the collateral-order exception. Because the order could be reviewed subsequent to entry of the final forfeiture order, as it is now, it did not raise a separate question of high value that

would evade review if not considered immediately. Moreover, the district court entered an order staying execution of the judgment pending resolution of all of the appeals of the claimants to the Defendant Property, ensuring that Battle Born's disposition could be assessed on appeal without prejudice, as with other claimants'. CR-133.

This Court has regularly reviewed orders striking claims upon the entry of final judgments. *See*, *e.g.*, *United States v. $129,374 in U.S. Currency*, 769 F.2d 583, 584–85 (9th Cir. 1985) (conservator appealing both denial of his motion for intervention and summary judgment in favor of government).

In urging otherwise, Battle Born cite *United States v. Contents of Accts. Numbers 3034504504 & 144-07143 at Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 971 F.2d 974, 976 (3d Cir. 1992), for the proposition that the district court's order striking Battle Born's claim is immediately appealable. AOB 7–8. This decision is not persuasive authority.

The Third Circuit case is not binding upon this Court. *Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001). But neither is the footnote, for which Battle Born cite the case, binding on the Third Circuit itself. In Footnote 3, the Third Circuit noted that the parties agreed that the order striking Friko Corp.'s claim was the denial of a motion to intervene that was "final and appealable as of right," and that the Court accepted this. *Id.* at 978 n.3. But even though Friko appealed the

district court's striking of its claim on the two accounts that constituted the

defendant property in the *in rem* forfeiture proceedings, there was a final, default

judgment of forfeiture in place. *Id.* at 975. And the Third Circuit found that its

"appellate jurisdiction" was "over the district court's final judgment pursuant to 28

U.S.C.A. § 1291." *Id.* at 978. Thus, Footnote 3 was dicta—"a statement in a

judicial opinion that could have been deleted without seriously impairing the

analytical foundations of the holding—that, being peripheral, may not have

received the full and careful consideration of the court hat uttered it." *In re

McDonald*, 205 F.3d 606, 612 (3d Cir. 2000) (internal quotations and citation

omitted). It was therefore not even binding upon subsequent panels of the Third

Circuit. *United States v. Mallory*, 765 F.3d 373, 381 (3d Cir. 2014).

Furthermore, the Third Circuit's dicta is unpersuasive. It is true that an

order denying a motion to intervene may sometimes qualify as an immediately

appealable collateral order. *See Robert Ito Farm, Inc. v. Cnty. of Maui*, 842 F.3d

681, 688 (9th Cir. 2016). But that is only when all three prongs of the collateral-

order doctrine are met—where, for example, the "intervention issue is completely

separate from the merits of the underlying action." *Stringfellow v. Concerned

Neighbors in Action*, 480 U.S. 370, 375 (1987) (government sought injunctive

relief requiring petitioners to abate the release of harmful stances from a disposal

site, and to take remedial steps to correct unsafe conditions, and respondent sought

57

to intervene). That separation plainly does not exist in this civil forfeiture action, where the shape of any final forfeiture order is based on the merits of the various claims against the Defendant Property.

In *Robert Ito Farm, Inc.*, 842 F.3d at 688, this Court explained that a would-be intervenor was permitted to appeal the denial of his motion to intervene because, as a non-party, he would have no ability to appeal the final judgment. *See* Dkt. 11 at 9. But that is not true for Battle Born. Even though they are not named parties to the civil forfeiture action, Battle Born may still, as it is presently doing, challenge the portions of the litigation pertinent to them under *Devlin v. Scardelletti*, 536 U.S. 1, 8–9 (2002). *Devlin* held that a nonnamed member of a class who had failed to successfully intervene was nevertheless permitted to appeal the final settlement of the class-action suit. *Id.* "The District Court's approval of the settlement—which binds petitioner as a member of the class—amounted to a 'final decision of [petitioner's] right or claim' sufficient to trigger his right to appeal." *Id.* at 9. Devlin was therefore permitted to appeal both the district court's dismissal of his intervention motion and its decision to approve the settlement to which he objected. *Id.* at 5–9. Similarly, because Battle Born is bound by the forfeiture order, Battle Born may appeal the final judgment to the extent that it is erroneously premised on the district court's striking of Battle Born's claim. *See United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA*, 545

F.3d 1134, 1140 (9th Cir. 2008) (explaining that "[o]n appeal of a final judgment, the interlocutory order merges in the final judgment and may be challenged in an appeal from that judgment" (internal quotations and citation omitted)). Indeed, *in rem* forfeiture actions are unique in that even if the district court dismisses the government's complaint—ostensibly eliminating one of the two parties—the court still retains jurisdiction and has a duty to resolve competing claims to the *res. Id.* at 1144–45.

The ramifications on judicial efficiency also mitigate against permitting a claimant to immediately appeal the district court's order striking his claim. A notice of appeal divests the district court of jurisdiction over the matters appealed. *Kern Oil & Ref. Co. v. Tenneco Oil Co.*, 840 F.2d 730, 734 (9th Cir. 1988). Because the validity of a claim shapes the forfeiture order, a claimant's appeal of an order striking his claim necessarily prevents a district court from determining the final forfeiture order until after the appeal is resolved. Where, as in this forfeiture action, numerous claimants have filed claims—some in an untimely fashion—there may be multiple appeals pertaining to the same *in rem* action filed at different times, all delaying the ultimate forfeiture action in the district court. And the final forfeiture order may be subject to still further appeal.

By contrast, where a claimant's notice of appeal as to an order striking his claim is only effective once there is a final judgment, the district court may

expeditiously determine whether and how much of the defendant property should be forfeited to the government.  At that point, this Court may review the final judgment against any and all appellate claims, including claims that the district court erroneously struck a prospective claimant.

## CONCLUSION

For the forgoing reasons, this Court should dismiss the appeal in C.A. No. 22-15513 and affirm the district court's judgment in C.A. No. 22-16348.


Dated:  February 7, 2023        Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

MATTHEW M. YELOVICH
Chief, Appellate Section, Criminal Division

*/s/ Merry Jean Chan*
MERRY JEAN CHAN
Assistant United States Attorney

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 17.  STATEMENT OF RELATED CASES PURSUANT TO CIRCUIT RULE 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**    **22-15113, 22-16348**

The undersigned attorney or self-represented party states the following:

[  ]  I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[X] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case is:

- *United States v. Ilija Matusko*, Nos. 22-15514 & 22-16349 (claimant's appeal out of the same district court civil action)
- *United States v. Lucas E. Buckley, as Trustee of the Gox Victim Bitcoin Trust*, No. 22-16248 (claimant's appeal out of the same district court civil action)
- *United States v. Roman Hossain*, No. 22-16085 (claimant's appeal out of the same district court civil action)

**Signature**  */s/ Merry Jean Chan*                **Date**  February 7, 2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

61

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8.  CERTIFICATE OF COMPLIANCE FOR BRIEFS
*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  22-15113, 22-16348

I am the attorney or self-represented party.

**This brief contains** **13,943** **words,** including 0 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** _s/ Merry Jean Chan_ **Date** February 7, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

62